**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Fidel Barragan VARGAS, Joel Victor Angulo, Felizardo Perez Casarez, Octavio Galvez Angulo, and Jaime Limon, Defendants–Appellants.**

**UNITED STATES of America,**
**Cross–Appellant,**

v.

**Fidel Barragan VARGAS, Joel Victor Angulo, Octavio Galvez Angulo, and Jaime Limon, Cross–Appellees.**

Nos. 89–10642, 90–10000, 90–10001, 90–10006, 90–10010, 90–10042, 90–10066, 90–10069 and 90–10071.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 18, 1991.

Decided March 8, 1991.

As Amended June 7, 1991.

702

Thomas E. Flynn, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

John F. Garland, Fresno, Cal., for defendant-appellant, Fidel Barragan Vargas.

Michael Berdinella, Fresno, Cal., for defendant-appellant, Joel Victor Angulo.

Victor M. Chavez, Asst Federal Public Defender, Fresno, Cal., for defendant-appellant, Felizardo Perez Casarez.

Daniel L. Harralson, Harralson & Dyer, Fresno, Cal., for defendant-appellant, Octavio Galvez Angulo.

W. Scott Quinlan, Fresno, Cal., for defendant-appellant, Jaime Limon.

Before SCHROEDER, PREGERSON and T.G. NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

Five defendants were jointly tried on a two-count indictment and convicted of con-

spiracy to distribute cocaine and heroin and possession with intent to distribute. They challenge their convictions. In four of the five cases, the government cross-appeals, arguing that the district court misapplied the Sentencing Guidelines by failing to enhance the defendants' offense levels for a co-defendant's possession of a firearm. For the reasons explained below, we reverse the convictions and remand for a new trial.

## I

On February 16, 1989, at the end of an undercover investigation, local police raided a house at 556 S. Sierra Vista in Fresno, California. Fidel Vargas was arrested in the front yard. The other four defendants fled and were arrested in the yards of neighboring residences. Perez–Casarez was arrested in the yard of the house immediately to the north of the target house, attempting to hide a gun inside a bale of hay. In the same yard, about forty to fifty feet away, police found a plastic bag containing approximately ten ounces of heroin and five kilograms of cocaine.

The defendants were jointly charged, tried, and convicted for possession of the drugs found in the neighboring yard and conspiracy to distribute them. The primary witnesses for the prosecution were Detective Herman Peterson of the Fresno Police Department, who posed as the buyer, and Arnulfo Ramirez, a paid informant. Another paid informant, Jesus Perez, intitiated the contact with the defendants but did not testify. The only defendant to testify was Fidel Vargas, the first defendant to be contacted by the government agents. Vargas argued that he was entrapped into arranging the contemplated drug transaction.

Detective Peterson testified about a series of conversations whose participants included, in various combinations, Peterson, the informants, and defendants Vargas, Octavio Angulo, and Joel Angulo. Peterson's testimony directly implicated these three defendants in a conspiracy to distribute drugs. According to Peterson's testimony, two additional men were scheduled to bring the drugs to the Sierra Vista house, where the transaction would occur. Peterson arranged to wait outside in the car while Ramirez went inside to verify that the drugs had arrived. Peterson was not expected to enter the house with the money until after Ramirez left the house and confirmed the presence of the drugs. Peterson's real plan, which he followed, was to signal surveilling officers to move in for an arrest as soon as Ramirez confirmed that the drugs were in the house.

To connect the defendants with the drugs found in the neighbor's yard, and to connect Limon and Perez–Casarez with the conspiracy, the prosecution relied primarily on the testimony of Arnulfo Ramirez. The defendants argue that their sixth amendment rights of confrontation and cross-examination were violated by the unusual and restrictive procedures the district court ordered for handling Ramirez's testimony before the jury.

At the time of trial, Ramirez was in the custody of the Los Angeles County Sheriff, awaiting trial on a murder charge. Ramirez's attorney in that case refused to let federal prosecutors speak with Ramirez when they initially brought him to Fresno. On the first day of trial, outside the jury's presence, the prosecutor announced to the court that he was afraid Ramirez might refuse to testify on fifth amendment grounds. The court made it clear that defense attorneys would not be permitted to question Ramirez about the events that led to the pending state murder charge. The defendants do not challenge that ruling. In addition, the court granted Ramirez immunity and appointed a local attorney to advise him. Although Ramirez stated that he was willing to testify before a jury, the court apparently was concerned that Ramirez might nevertheless refuse to answer questions before the jury.[1]

---

1. The record does not explain why it was necessary to avoid a situation in which the government's witness invoked the fifth amendment or otherwise refused to answer questions before the jury. In its briefs, the government asserts that if Ramirez had refused to answer a ques-

The court devised the following procedure. It directed the attorneys to question Ramirez under oath but outside the jury's presence. The prosecutor then conducted the direct examination and the defense attorneys cross-examined. A court reporter prepared a transcript and edited out all objections, arguments to the court, and the court's rulings and responses. The next day, the witness Ramirez took the stand with the jury present.[2] The court and the attorneys had a copy of the edited transcript of the testimony that Ramirez gave outside the jury's presence, but Ramirez had no transcript. The court required the attorneys to conduct their examination before the jury by reading the questions from the edited transcript. No other questions were permitted. If the court deemed that Ramirez's answer before the jury was inconsistent with the answer he gave the day before, the court then read to the jury, from the transcript, Ramirez's earlier answer. The attorneys were then directed to proceed to the next question in the transcript, without exploring the discrepancies between Ramirez's differing answers. This procedure was followed for both the direct and cross-examination. The court advised the attorneys of this procedure in advance and cautioned them in the first session, with the jury absent, that they must ask every question that they wanted answered later before the jury.[3] The defendants objected to this procedure from the beginning, and after Ramirez testified freely out of the jury's presence, they renewed their objection to the requirement that questions during cross-examination before the jury must be drawn entirely from the transcript of Ramirez's testimony given outside the jury's presence.

## II

■ The trial judge has discretion to impose reasonable limits on cross-examination, and this court finds error only when that discretion has been abused. *United States v. Jackson*, 882 F.2d 1444, 1446 (9th Cir.1989). When there is an abuse of discretion, there must be an inquiry into whether the error was harmless. When there is no constitutional violation, the error does not require reversal if it is more probable than not that it did not contribute to the verdict. *See id.* at 1447.

■ Whether limitations on cross-examination are so severe as to amount to a violation of the confrontation clause is a question of law reviewed de novo. *United States v. Jenkins*, 884 F.2d 433, 435 (9th Cir.), *cert. denied* — U.S. —, 110 S.Ct. 568, 107 L.Ed.2d 562 (1989). A violation of the confrontation clause, including a violation of the defendant's right to cross-examine and impeach a witness, is subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). The convic-

tion that was "central" to his testimony, the court might be required to strike Ramirez's direct testimony. And if an instruction to the jury would not be sufficient to cure the prejudice created by Ramirez's stricken testimony, the court might be forced to declare a mistrial.

Prosecutors are properly concerned about the risk and potential consequences of calling an untrustworthy witness who subsequently refuses to answer questions on cross-examination. The record is unclear why, without any request from counsel, the court took measures to avoid a risk of damage to the prosecution's case.

**2.** Ramirez did not take an oath before the jury, and the jury was not told that Ramirez was testifying under an oath taken earlier.

**3.** When Ramirez was questioned without the jury present, the court barred the defense attorneys from pursuing certain lines of inquiry that might have revealed that Ramirez had been arrested numerous times and received lenient treatment in exchange for work and testimony as an informant, and that Ramirez may have been promised lenient treatment on his pending state murder charge in exchange for his testimony. The defendants argue that these restrictions on particular lines of questioning also violated their sixth amendment right of confrontation. Because we conclude that restricting cross-examination before the jury to questions previously asked outside the jury's presence violated the sixth amendment, we have no need to consider whether the court unduly restricted certain lines of inquiry during the questioning outside the jury's presence. We note, however, that the defendants' arguments appear to have merit. Defendants must be accorded very wide latitude when cross-examining a paid informant about his motives for testifying and his interest in producing testimony on behalf of the prosecution.

tion must be reversed unless this court is persuaded beyond a reasonable doubt that the error was harmless.

■ The admission into evidence of out-of-court statements, offered by the prosecution to prove that they are true, can also violate the Federal Rules of Evidence and the confrontation clause. The trial court's decision to admit such out-of-court statements is reviewed de novo. Violations of evidentiary rules are subject to harmless error analysis under the more-probable-than-not standard, unless they are also violations of the confrontation clause, in which case the conviction must be reversed unless this court is persuaded beyond a reasonable doubt that the error was harmless.

**A**

■ Evaluation of Ramirez's testimony and defendants' opportunity to cross-examine him should focus on the proceedings that took place with the jury present. When the court read from the transcript of the questioning that occurred outside the jury's presence the day before, it was submitting prior sworn testimony for the jury's consideration.[4]

The judge explained to the attorneys that he would read Ramirez's prior inconsistent statements "as impeachment," and the government's briefs also refer to the prior testimony as impeachment. The judge read Ramirez's prior answers to the jury immediately after Ramirez gave an answer that the judge deemed inconsistent. Because the jury was never instructed to consider this prior testimony solely as impeachment, it must be regarded as substantive evidence.

■ Testimony given in prior judicial proceedings may, despite the rule against hearsay, qualify as admissible evidence and satisfy the confrontation clause. When witnesses are unavailable, their prior testi-

mony, if given under oath and subject to cross-examination at the time it was given, is admissible as an exception to the hearsay rule. Fed.R.Evid. 804(b)(1). It may also be admitted without violating the confrontation clause. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (confrontation clause not violated by admitting transcript of unavailable declarant's sworn testimony at preliminary hearing). In this case, Ramirez was available as a witness. Rule 804(b)(1) therefore does not apply, and neither does the exception to the confrontation clause approved in *Roberts*.

When the declarant is available, as Ramirez was, prior testimony may qualify as nonhearsay and be admitted as substantive evidence under Fed.R.Evid. 801(d)(1). But the declarant must testify at trial and be subject to cross-examination concerning the prior testimony.[5] Although Ramirez testified before the jury, he was not subject to cross-examination concerning the prior testimony. *See United States v. Owens*, 484 U.S. 554, 561, 108 S.Ct. 838, 843, 98 L.Ed.2d 951 (1988). The court did not allow the attorneys to ask whether Ramirez's memory was better during his present testimony or during the earlier questioning. They could not even ask Ramirez if he admitted giving the prior testimony. Thus, when the prosecution, dissatisfied with Ramirez's answers before the jury, persuaded the judge to read the prior testimony, the procedure violated Rule 801(d)(1) because defendants were precluded from cross-examining Ramirez about the out-of-court statements.

The government relies on *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), for the proposition that the courts have approved "much more drastic" uses of prior recorded testimony without violating the confrontation clause. *Green*, however, is distinguishable, be-

---

**4.** The jury, however, was never told that the court was reading testimony, sworn or otherwise.

**5.** Rule 801 provides:
   (d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition....

cause in *Green* the declarant who made the prior statement was available for cross-examination about the statement. *Id.* at 166–67, 90 S.Ct. at 1939–40. Thus, as the commentary to the federal rules explains, the testimony in *Green* would have been admissible under Rule 801(d)(1). *See* Adv. Comm. Notes, Rule 801(d)(1). In our case, on the other hand, the trial judge did not permit Ramirez to be cross-examined about the prior statements that were read from the transcript of the earlier questioning. Thus, a key factor that satisfied the confrontation clause in *Green* and *Owens* is missing here. That factor is essential. We believe that Rule 801(d) articulates a minimum requirement of the confrontation clause by requiring that an available declarant be subject to cross-examination about the prior testimony. We therefore conclude that the admission of Ramirez's prior statements in violation of Rule 801(d)(1) also violated the defendants' rights under the confrontation clause.

### B

■ Ordinarily, after finding that the admission of certain classes of statements violated the rules of evidence and the confrontation clause, we would determine which statements were improperly admitted and attempt to assess their prejudicial effect. In this case, however, the procedure instituted by the district court prevents such an orderly analysis.

The court did not give any explanation of its procedure to the jury except to inform them, at the end of the trial, that Ramirez was testifying under a grant of immunity. Neither the court nor any witnesses even told the jury that Ramirez gave sworn testimony outside their presence the day before. Nor were jurors told that the court was reading from a transcript of that sworn testimony. When instructing the jury, the court explained that the evidence in the case consisted solely of the exhibits and the sworn testimony of the witnesses. Yet Ramirez was never sworn in the jury's presence, and no one told the jury that Ramirez was testifying under an oath he took earlier. As far as the jury knew,

Ramirez was not testifying under oath and arguably, therefore, was not giving evidence. The court also explained that the arguments of counsel and the comments of the court were not evidence. The jury received no specific instruction about how to evaluate what they heard when the court read portions of the transcript of Ramirez's testimony. If the jury regarded it as "comments of the court," then they could have believed that it was not evidence. Nevertheless, it is clear that all participants in the trial believed that the portions of the transcript read to the jury were part of the evidence. The attorneys referred to it in their arguments, and the court referred to it in resolving an objection about what testimony was before the jury.

Putting aside the problem of instructions, the actual presentation of Ramirez's testimony, interrupted by readings of prior testimony, was confusing. For example, when testifying with the jury absent, Ramirez said that he was inside the house with all five defendants present. He said that Joel Angulo introduced himself and identified two others present as the owners of the cocaine and the heroin. Ramirez then indicated which of the two defendants he was talking about. The prosecutor announced for the record that Ramirez had identified Limon as the owner of the cocaine and Casarez–Perez as the owner of the heroin.

When testifying before the jury, however, Ramirez's testimony was not so clear. Because the attorneys were not permitted to deviate from the transcript, they could not clarify whom Ramirez was identifying. The court read portions of Ramirez's answers from the previous day's testimony, but Ramirez had not identified anyone by name—his identifications were couched in terms of seating arrangements. The jury was not told that all defendants and attorneys were seated in the same relative positions that they occupied when this previous testimony was given. The following excerpt from the record shows what the jury heard when Ramirez was asked to make an identification:

BY MR. EDELMAN [the prosecutor]:

Q. And the gentleman who Joel Angulo identified as the owner of the heroin, do you see him?

A. Yes.

MR. BERDINELLA [defense attorney]: May we have yesterday's answer, your Honor?

THE COURT: Yesterday was: "Yes, I think it was the one over here, next to Joel." Drop down to line 14.

■ The admissible testimony of Ramirez consisted of his answer "yes," which did not identify anyone. The answer read by the court was not admissible, because Ramirez was available as a witness but was not subject to cross-examination about the prior statement.[6] Even if the prior statement were admissible, it is not apparent how it can serve to identify anyone, as the jurors were provided no information about who was sitting next to Joel when the statement was originally made the day before.

It was even more confusing when the prosecutor asked Ramirez to identify the person to whom Joel Angulo referred as the owner of the cocaine. The day before, Ramirez responded by referring to the person sitting in a certain position, and the prosecutor announced for the record that Ramirez had identified Limon. Before the jury, however, Ramirez apparently identified someone else. The record does not reveal whom Ramirez identified, because the attorneys were not permitted to deviate from the script of the earlier questioning, even for the purpose of announcing whom Ramirez had identified. Following the judge's procedure, the prosecutor then read his next line from the transcript, which indicated that Ramirez identified Limon, even though he had not identified Limon.

In the following excerpt from the record, the first question is by Mr. Edelman, the prosecutor. Mr. Harralson is a defense attorney:

Q. The one with the cocaine was which one?

A. The one with the cocaine was the one on this side; not the first one, but the second one.

THE COURT: The answer yesterday was: "The one next to—next to the young girl."

BY MR. EDELMAN:

Q. Identifying the defendant Jaime Limon.

THE COURT: Just a moment, I don't think that you can say that answer identified anybody, Counsel.

MR. EDELMAN: I'm just reading the transcript as ordered by the Court, your Honor.

MR. HARRALSON: Move to strike that, your Honor.

THE COURT: What page?

MR. EDELMAN: Page 12, line 6.

THE COURT: That's not a question, Counsel. That's a statement. Now, we've got a problem here because the answer yesterday was "the one next to the young girl," and clearly he didn't identify that same person today.

MR. EDELMAN: Well, would the Court instruct the jury that yesterday he identified the defendant Jaime Limon?

THE COURT: I read the statement as he said it yesterday. Now, drop down to line 7.

Record, at 658–59. The court never ruled on the motion to strike the prosecutor's statement that Ramirez identified Limon. As these excerpts show, the jury heard information that was submitted in violation of the hearsay rule and defendants' rights under the confrontation clause. In addition, the presentation was so confusing that it is doubtful that the jury would know how to evaluate it without instructions from the court. The only instructions from the court, however, undoubtedly compounded the confusion. Applied literally, they instructed the jury to disregard Ramirez's testimony because they had no information that he was under oath. They also told the jury to disregard the prior testimony, because the comments of the court are not

---

6. Naturally, hearsay problems and confrontation violations can be waived. Considering the situation and defendants' overall objection to the entire procedure, however, we do not regard their request for the earlier testimony as a waiver of the defendants' objections.

evidence. Surely the court did not intend that the jury would interpret his instructions to mean that they should disregard Ramirez's testimony entirely. We cannot say with confidence how the jury understood the confusing instructions or Ramirez's confusing testimony.[7] We do not conclude that the inadmissible portions of Ramirez's testimony had no effect.

### C

We have already determined that some of Ramirez's statements were admitted in violation of the confrontation clause. We now consider the restrictions the court imposed on the defense attorneys' cross-examination of Ramirez when he appeared before the jury.

█ In determining whether a restriction on cross-examination violates the confrontation clause, the Supreme Court has suggested a standard:

> [A] criminal defendant states a violation of the confrontation clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). By restricting the defendants from following up on answers that Ramirez gave for the first time during his testimony before the jury, the court prevented them from determining whether Ramirez was telling the truth the first time or the second time, or, more importantly, whether he even knew the difference. The defendants were thus prevented from fully developing a prototypical form of impeachment: showing that the witness was shifty and evasive and that his memory, if that is what he was

sincerely relying on, was not to be trusted. Under the procedure adopted by the court, the defendants were prevented from extracting an admission from Ramirez that his testimony did indeed contradict his testimony of a day earlier. To give the jury "a satisfactory basis for evaluating" which, if any, of the contradictory statements is the truth, *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970), the confrontation clause guarantees the right to ask Ramirez to explain the apparent inconsistency. We conclude that by requiring defense attorneys to adhere to the transcript of the deposition without permitting any new questions, the district court abused its discretion and denied defendants their sixth amendment right of confrontation.

Moreover, we conclude that the district court did not simply overstep the bounds of permissible restrictions on cross-examination; it denied cross-examination altogether. Reading each new question from a prepared script, without regard to how the witness responded to the previous question, is simply not cross-examination as we know it. Here, as the trial court even acknowledged, Ramirez in effect had a trial run, a practice cross-examination out of the jury's presence. When testifying before the jury, every question Ramirez answered was already familiar, and he had the opportunity to perfect his answer. The defense attorneys, however, did not have the corresponding opportunity to point out that Ramirez had the opportunity to perfect his answer. They could not ask, for example, if it was true that he identified certain defendants much more readily in front of the jury than he had the day before. They could not ask Ramirez if he had discerned, from yesterday's questioning, that today's answer was more helpful to his employers than his more halting and hesitant answer of the day before.

---

7. Some defendants argue, without elaboration, that the procedure for questioning Ramirez violated their right to due process. If due process protects defendants' right to orderly procedures designed to ensure a verdict based only on properly admitted evidence evaluated in a rational manner according to proper instructions of law, the defendants may well have a solid due process argument. We express no opinion on this question.

The confrontation clause guarantees that the prosecution's case will be subject to "the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings." *Maryland v. Craig,* —— U.S. ——, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). Witnesses must testify under oath and submit to cross-examination not only in the presence of the accused, but also in the presence of the factfinder. Trial attorneys attune themselves to the jury's response to a witness's live testimony, and the art of cross-examination depends on an attorney's sixth sense of both the jury, the witness, and the dynamic between them, which cannot be captured and recorded in a reporter's transcript. After spending days studying the jury that will decide a client's fate, experienced trial attorneys may well adjust their questioning to the nuances of the jurors' reactions. Blank looks counsel caution; one grimace can end a line of inquiry. Trial attorneys cannot prepare their cross-examinations entirely in advance. As our system of trial procedure has evolved, the opportunity for effective cross-examination depends on attorneys' ability to adjust their questioning as they constantly reassess the jurors' reactions to the witness and the previous questions. In this case, the district court's procedure strait-jacketed the defense attorneys and left no room for them to ask the probing questions that can be prompted by the dynamics of spontaneous questioning. This was not the cross-examination that the sixth amendment guarantees.

### D

▮▮▮ Violations of the confrontation clause do not require reversal if the reviewing court is convinced beyond a reasonable doubt that the error was harmless. *Delaware v. Van Arsdale,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). When the confrontation clause is violated by a restriction on the scope of cross-examination, the Supreme Court instructs reviewing courts to consider "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reason-

able doubt." *Id.* at 684, 106 S.Ct. at 1438. The factors to consider include the importance of the witness's testimony to the prosecution's case, whether the testimony was cumulative, whether there was evidence corroborating or contradicting the witness, the extent of cross-examination actually permitted, and the overall strength of the prosecution's case. *Id.*

In this case, the approach suggested in *Van Arsdall* is not appropriate, because the district court did more than restrict the scope of cross-examination. In effect, the district court prohibited the defense attorneys from cross-examining Ramirez entirely.

Because the defendants, in effect, were denied the opportunity to cross-examine Ramirez, his testimony should have been stricken. In evaluating whether the error was harmless, we must ask whether we are convinced beyond a reasonable doubt that Ramirez's testimony did not contribute to any of the convictions. In some cases, perhaps, it might be harmless error to permit the testimony of a very minor witness to reach the jury without cross-examination. This is not such a case. In a criminal case, the complete denial of the opportunity effectively to cross-examine a witness who delivers live testimony on material issues cannot be considered harmless error.

An examination of the Ramirez's central role in this case demonstrates that the confrontation error was not harmless. Because Ramirez established the only solid link between the five defendants and the drugs found in the neighboring yard, his testimony contributed to every defendant's conviction for possession. Ramirez's testimony was also central to the conspiracy convictions of Limon and Perez–Casarez. All that remain are the conspiracy convictions of Vargas and the Angulo brothers. The prosecution may have been able to convict these three defendants of conspiracy without the testimony of Ramirez. The question here, however, is not whether the convictions could be sustained if they had been obtained without any testimony at all from Ramirez. Instead, we must consider whether we are convinced that

Ramirez's testimony did not contribute to the convictions. Ramirez's testimony solidly implicated Vargas and the Angulo brothers in the conspiracy, and it was not simply cumulative to Detective Peterson's testimony. It may well have contributed to the convictions, and we certainly cannot say that we are convinced beyond a reasonable doubt that it did not contribute to the conspiracy convictions.

We conclude that the violations of the confrontation clause were not harmless error with regard to any of the convictions. All the convictions are reversed.

### III

The government appeals the sentences of Vargas, Octavio Angulo, Joel Angulo, and Jaime Limon. We discuss this issue to guide the district court in case any of the defendants are convicted after a second trial.

At sentencing, the district court found that defendant Perez–Caserez possessed a 9 mm. handgun during the offense and enhanced his offense level by two points in accordance with § 2D1.1(b)(1) of the Sentencing Guidelines. On the basis of the gun possessed by Perez–Caserez, the probation officer recommended similar two-point enhancements in the offense levels for each of the other four defendants. After hearing objections by the defendants, the court declined to impose the enhancements, and the government appealed.

The Sentencing Guidelines authorize a two-point enhancement of the offense level if a firearm is possessed during the commission of a drug trafficking offense. U.S.S.G. § 2D1.1(b)(1). In determining the offense level, the judge must consider "all acts ... for which the defendant would be otherwise accountable, that occurred during the commission of the offense." U.S.S.G. § 1B1.3(a)(1). The commentary further explains that the acts for which defendants "would be otherwise accountable" include "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3 comment (n. 1).

These sections of the guidelines provide that when one conspirator possesses a firearm in furtherance of the conspiracy, it may be appropriate to enhance the offense levels of the co-conspirators even if the gun is not actually used and they were not aware of its presence. *United States v. Willis*, 899 F.2d 873, 874 (9th Cir.1990). In deciding whether the enhancement is appropriate, the district court must determine whether the co-conspirators reasonably should have foreseen that one of their number would possess a gun. *Id.* The district court's resolution of the question, whether possession of a gun in furtherance of a conspiracy was reasonably foreseeable, is reviewed for clear error. *Id.* at 874.

In *Willis*, the district court did not expressly find that the defendant should have reasonably foreseen that her husband, a convicted co-conspirator, would possess a firearm during the offense. Nevertheless, we interpreted the court's statements about responsibility for the acts of co-conspirators as such a finding. We further noted that the facts supported a finding that the defendant should have reasonably foreseen that her husband would carry a gun. Indeed, the evidence supported an inference that she saw the gun, which DEA agents reported was visible in her co-conspirator's waistband. We noted that trafficking in narcotics is frequently related to possession of firearms and also observed that when conspiracies are small and the participants know each other well, a judge may infer that they were aware of the actions of their cohorts. *Id.* at 875. We affirmed the judge's decision to enhance the sentence.

As in *Willis*, the district court here made no express finding on whether it was reasonably foreseeable to Limon, Vargas, or the Angulos that Perez–Caserez would possess a firearm or whether that possession was in furtherance of the conspiracy. In this case, we would not be able to conclude, as we did in *Willis*, that a finding of no reasonable foreseeability was implicit in the judge's decision not to enhance the offense level. Because each defendant's

relationship to the conspiracy was different, we would expect the court to analyze separately, from each defendant's perspective, whether it was foreseeable that another conspirator would possess a weapon. The court, however, lumped the four unarmed defendants together when analyzing whether their offense levels should be enhanced because of the gun Perez–Casares possessed. This group analysis suggests that the court's refusal to enhance is not based on an implicit finding that each defendant could not reasonably have foreseen that guns would be involved.

It is also possible that the court implicitly found that Perez–Casarez did not possess the gun in furtherance of the conspiracy. On the other hand, it is also possible that the court made no such finding or that the court erroneously believed that each co-conspirator must actually know about or possess the gun before enhancement is appropriate. Unlike *Willis*, the court did not explain the sentences in language that comes close to approximating the appropriate legal standard.

### IV

Joel Angulo and Limon also argue that there was insufficient evidence to sustain their convictions. We will reverse a conviction for insufficiency of the evidence only if no rational trier of fact could find each element of the crime beyond a reasonable doubt. When reviewing the sufficiency of the evidence, we consider all the evidence in the trial, even the testimony that was admitted improperly. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 290–91, 102 L.Ed.2d 265 (1988). After examining the record, we conclude that there was sufficient evidence to sustain the convictions.

### V

The defendants' sixth amendment rights of confrontation and cross-examination were violated, and the error was not harmless. The convictions are reversed and this case is remanded for further proceedings.