**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1754
_____

UNITED STATES OF AMERICA

v.

KENNETH R. DOUGLAS,
Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA
(D.C. No. 2-09-cr-00105-009)
District Judge: Hon. David S. Cercone
_____

Argued March 23, 2016
_____

Before: GREENAWAY, JR., VANASKIE, and SHWARTZ,
Circuit Judges.

(Filed: February 22, 2017)

Arnold P. Bernard, Jr., Esq. [ARGUED]
437 Grant Street
Suite 407
Frick Building
Pittsburgh, PA 15219
         Counsel for Appellant


Michael L. Ivory, Esq. [ARGUED]
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
         Counsel for Appellee

_____

OPINION OF THE COURT

_____

SHWARTZ, <u>Circuit Judge</u>.

Kenneth Douglas appeals his sentence, arguing that the District Court incorrectly held him responsible for trafficking more than 450 kilograms of cocaine, erroneously applied sentencing enhancements for abuse of a position of trust under U.S.S.G. § 3B1.3 and obstruction of justice under U.S.S.G. § 3C1.1, and failed to appropriately consider the disparity between his sentence and those imposed on his co-conspirators. For the reasons discussed below, we will affirm the sentence with respect to the drug calculation and enhancement for abuse of a position of trust, but reverse the obstruction of justice enhancement.

I

Douglas participated in a conspiracy to distribute cocaine. The conspiracy began years before he joined it, when Tywan Staples, who lived in the San Francisco area, began supplying marijuana to his cousin Robert Russell Spence in Pittsburgh. Staples and Spence went from selling small amounts of marijuana to shipping four to six kilograms of cocaine across the country several times a month. After law enforcement intercepted several packages containing money and drugs, the conspirators began using couriers to carry drugs and money on commercial flights. By 2008, six different couriers were transporting cocaine out of the Oakland, California airport. After two of the couriers were arrested, the conspirators began using San Francisco International Airport ("SFIA") instead.

Staples, who worked at the "maintenance base" at SFIA, knew Douglas, who was an airline mechanic for United Airlines. Douglas had an Airport Operation Authority ("AOA") badge that enabled him to enter the airport terminal without being screened at a Transportation Security Administration ("TSA") checkpoint.[1] Unlike Douglas, Staples did not have the ability to enter the terminal without

---

[1] Douglas's supervisor described the way Douglas would access the terminal. To enter the terminal through a secured employee entrance, an employee has to use his AOA badge as well as place his hand on a biometric scanner. However, to leave the terminal, only the AOA badge is required. On a random basis, the TSA would search employees entering the terminal.

inspection. For that reason, when Douglas asked Staples if he had "any way [Douglas] could make some extra money," Staples invited him to join the conspiracy. Douglas accepted.

Staples and Douglas facilitated the movement of cocaine in a simple way. Staples would deliver the cocaine to Douglas packed in a bag with clothing. Douglas would then smuggle the bag into the terminal and either transfer it to a courier once inside the secured area of the terminal, or board the plane as a passenger with the drugs.

Staples testified that Douglas assisted with the movement of the cocaine "40 to 50 times," transporting ten to thirteen kilograms of cocaine on each occasion. App. 102. Douglas transported drugs himself on seventeen occasions. Unlike the couriers, he was not required to bring cash back to California, so as to avoid any risk of being caught, which would, in turn, shut down the conspiracy's San Francisco distribution activities. Staples testified that Douglas was paid $5,000 each time that he smuggled cocaine into the airport, and another $5,000 each time he delivered a shipment himself.

Using airline records, the Government identified forty-six specific flights departing from SFIA between January and November of 2009 that were associated with the conspiracy, including seventeen flights on which Douglas personally transported drugs, sometimes using his employee benefit tickets. These flights included very short round trips that were inconsistent with personal travel, and corresponded to phone calls among the conspirators, the use of pre-paid credit cards, and the timing of deposits into Douglas's bank account.

4

Following an investigation, a grand jury returned an indictment against Douglas and twenty-one co-defendants. Douglas was charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h). Douglas was arrested and released on bail, subject to several conditions, including travel restrictions and a requirement that he appear for court proceedings. While Douglas was on bail, the Probation Office discovered that he had booked a flight to Jamaica without permission. At his bail revocation hearing, Douglas claimed he had mistakenly booked a flight for himself while booking a flight for his wife. The District Court did not revoke his bail, but modified his conditions of release to require him to call probation daily to verify his whereabouts.

Douglas's trial was scheduled to begin on January 8, 2014. He failed to appear for the first day of trial. The next day, he filed a motion for a continuance claiming that he "was receiving medical attention on January 8, 2014 and was unable [to be] in court for that reason." Supp. App. 47. In connection with the motion, Douglas submitted documents showing that he was admitted to the emergency room around 2:00 a.m. on January 8, complaining of chest pain. The records show that he was treated with aspirin and intravenous insulin, transported via ambulance to an urgent care facility, and had a series of tests in both medical facilities. Douglas's EKG revealed possible heart blockage, and his blood tests indicated he had an abnormal white blood cell count, as well as an elevated enzyme level that can be indicative of a heart attack. He received instructions for taking eight over-the-counter and prescription medications, in addition to the

medication he was already taking for diabetes. Douglas was also instructed to schedule follow-up testing and appointments with several specialists. Douglas was also given a doctor's note bearing the time 4:12 p.m. asking that he be excused from court on January 8.

Based on this evidence, the Government argued that it was "possible that [Douglas] went there [at] 2:00 in the morning faking this illness, so he wouldn't have to be here today. It is also possible that that was a legitimate illness. I don't think that anything in the records tells us one way or the other." App. 388. Despite the hospital records, the District Court stated that "[t]here's no solid evidence, at least presented, that he was suffering from a medical condition that warranted him not to appear. It's really sort of ambiguous." App. 390–91. Expressing concern that Douglas would not appear for jury selection the following Monday, the District Court revoked his bail.

On January 13, 2014, a jury was selected for the joint trial of Douglas and a codefendant, but the next day, Douglas's attorney withdrew, Douglas's case was severed, and his trial was adjourned. His bail was reinstated but modified to require home detention and electronic monitoring.

Douglas obtained new counsel and later waived his right to a jury trial. At the bench trial, the Government offered testimony from several coconspirators, law enforcement officers, and a United Airlines supervisor. The Government also presented documents corroborating their testimony. Following the trial, the District Court convicted Douglas of both charges.

Before sentencing, the Probation Office submitted a pre-sentence investigation report ("PSR") recommending that Douglas be held responsible for 450 kilograms of cocaine, resulting in a base offense level of 38. Applying the grouping rules, the PSR recommended a two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Douglas had been convicted of conspiracy to engage in money laundering. The PSR also recommended a two-level enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3, and a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, for a total offense level of 44, which is treated as a 43, the maximum offense level under the Guidelines, which corresponds to a Guidelines sentence of life imprisonment. Douglas objected to the drug quantity as well as to the upward adjustments for obstruction of justice and abuse of a position of trust.

At sentencing, the District Court overruled Douglas's objections, citing Staples's testimony that Douglas smuggled between 10 and 13 kilograms of cocaine between 40 and 50 times, and concluding based on the number of trips that "there is ample evidence to show that [he] was responsible for more than 450 kilograms of cocaine." Supp. App. 236, 393, 403 (noting that his involvement was not an "anomaly"), 411 (observing that the evidence against him was "overwhelming").

The District Court also noted the presence of "aggravating factors," including that Douglas "use[d] [his] position of trust with the airlines and, more specifically, [his] level of security clearance to aid [him] in being part of th[e] conspiracy to distribute controlled substances and the amount of drugs that . . . [was] transported with [his] assistance was

7

enormous." App. 411. As to the obstruction of justice enhancement, the District Court relied upon Douglas's failure to appear on the first day of trial, but made no findings beyond those it made in its tentative findings, in which it deemed the objection to the enhancement to be "without merit." Supp. App. 237-47.

After determining the total offense level to be 43, the District Court noted that it had "gone through all of the 3553 factors[,] [ ] looked at them all to determine a sentence that [wa]s sufficient but not greater than necessary," decided to vary downward from the Guidelines sentence of life imprisonment, App. 411-12, and imposed a sentence of 240 months' imprisonment for each count, to be served concurrently, followed by five years of supervised release. Douglas appeals.

II[2]

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We exercise plenary review over the construction of the Sentencing Guidelines themselves. United States v. Greene, 212 F.3d 758, 760 (3d Cir. 2000). We review the factual determinations underlying a sentence for clear error. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc) (alterations and citations omitted).

We review sentences for both procedural and substantive reasonableness. United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). At the first stage, in which we review for procedural reasonableness, we seek to

> ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

Id. (alteration omitted) (quoting Gall v. United States, 552 U.S. 38, 50-51 (2007)). If the district court's sentencing procedure "passes muster, we then, at stage two, consider its substantive reasonableness," based on the totality of the circumstances. Tomko, 562 F.3d at 567 (internal quotation marks omitted); see also Gall, 552 U.S. at 51. Absent significant procedural error, "we will affirm [the sentence as substantively reasonable] unless no reasonable sentencing court would have imposed the same sentence on th[e] particular defendant for the reasons the district court provided." Tomko, 562 F.3d at 568.

We will first review Douglas's challenge to the drug quantity calculation and then address his arguments concerning the two Guidelines enhancements.

A

At sentencing, "the government bears the burden of

[proving drug quantity] by a preponderance of the evidence." United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993). While "some degree of estimation must be permitted," United States v. Collado, 975 F.2d 985, 998 (3d Cir. 1992), the district court must satisfy itself that the evidentiary basis for its estimate has sufficient indicia of reliability. See United States v. Miele, 989 F.2d 659 (3d Cir. 1993) (drug quantity estimation based solely on grand jury testimony of single drug-addicted witness who had contradicted himself was not sufficiently reliable). "'Indicia of reliability may come from . . . corroboration by or consistency with other evidence . . . .'" United States v. Freeman, 763 F.3d 322, 337 (3d Cir. 2014) (quoting United States v. Smith, 674 F.3d 722, 732 (7th Cir. 2012)).

The evidence supports the District Court's factual determination that Douglas was responsible for more than 450 kilograms of cocaine. Staples testified that Douglas smuggled "[10] or 13 kilograms" of cocaine through SFIA "40 to 50 times," App. 102, which totals between 400 and 650 kilograms of cocaine. Staples knew the amount of drugs because he provided Douglas with the cocaine, and nothing in the record suggests that his perception or memory was impaired in any way or that he provided inconsistent information on this topic. Cf. Miele, 989 F.2d at 666.

Furthermore, the Government corroborated Staples's testimony with flight records, telephone toll records, and bank deposits. It identified forty-six flights taken out of SFIA by various drug couriers, including Douglas, all of which depended on Douglas to smuggle drugs past security into the terminal. Even if each flight involved only the minimum 10 kilograms of cocaine, this would justify an estimate of over

450 kilograms. The fact that the number of flights was established through circumstantial evidence does not mean that reliance on it was error. See, e.g., United States v. Jones, 531 F.3d 163, 175 (2d Cir. 2008) ("The quantity of drugs attributable to a defendant is a question of fact. As such, if the evidence—direct or circumstantial—supports a district court's preponderance determination as to drug quantity, we must sustain that finding.").

Furthermore, the fact that Douglas used employee benefit tickets for some of the trips does not undermine the conclusion that the trips were taken for the conspiracy. Staples testified that Douglas sometimes used his benefits for these flights, despite the fact that doing so was riskier because he might be required to wait longer to board a flight.

Douglas's argument that cash deposits into his bank account could have come from gambling is also unavailing. The regularity of the deposits and the correspondence between the dates of the deposits and the suspicious flights provides a reasonable basis to infer that the flights were related to the conspiracy.[3]

---

[3] Douglas attempts to argue in the alternative that the District Court should have calculated the total drug quantity based only on the seventeen flights he personally took because the Government presented more specific evidence concerning its identification of these flights. While these flights were substantiated in more detail at trial, Staples's testimony, combined with the flight records for the other drug couriers and the deposits into Douglas's bank account, provide a sufficient basis for the District Court to conclude

In sum, Staples's testimony and the documentary evidence provide ample support for the determination that Douglas was responsible for more than 450 kilograms of cocaine, and the District Court did not err in so finding.

B

We next address the District Court's application of a two-level enhancement for abuse of a position of trust. U.S.S.G. § 3B1.3 calls for such an enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."

To determine whether a defendant occupies a position of trust for the purposes of § 3B1.3, we consider: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests [in the] defendant vis-à-vis [sic] the object of the wrongful act; and (3) whether there has been a reliance on the integrity of the person occupying the position." United States v. DeMuro, 677 F.3d 550, 567-68 (3d Cir. 2012) (quoting United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994)). We apply these factors mindful of the purpose of the enhancement, which is to "punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity." Pardo, 25 F.3d at 1192; see also DeMuro, 677 F.3d at 567-68.

---

that Douglas was involved in smuggling drugs approximately forty-six, rather than seventeen, times.

The application note to § 3B1.3 also states that positions of trust are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference) . . . [and are ones that] ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."[4]  § 3B1.3 cmt. n.1.

---

[4] The full note provides:

'[p]ublic or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk

Such discretion, however, is not necessarily contingent on the defendant holding a professional or managerial job title. See, e.g., United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002) (home health aide was in position of trust because she opened the victim's mail and paid bills for her, and "[t]hese tasks clearly invested [the aide] with considerable discretion since [the victim] did not monitor [her] closely and appeared to rely on her judgment and integrity."), abrogated on other grounds by Loughrin v. United States, 134 S. Ct. 2384 (2014). Whatever the defendant's title, our analysis focuses on whether the position grants the defendant the requisite degree of discretion "vis-à-vis [sic] the object of the wrongful act." Pardo, 25 F.3d at 1192.[5]

---

because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.

[5] In contrast, the Court of Appeals for the First Circuit uses "a two-step process" wherein a sentencing court must "first pos[e] the status question—asking whether the [defendant's] position was characterized by professional or managerial discretion and minimal supervision—" before moving "to the conduct question" of whether that position was abused. United States v. Parrilla Roman, 485 F.3d 185, 190-91 (1st Cir. 2007). Critically, the First Circuit evaluates whether a position is one of discretion and minimal supervision overall, as opposed to reviewing it in the context of the wrong that was committed. See id. at 192 (reasoning that the defendants were not "afforded discretion to establish policies or to supervise co-workers" but rather completed tasks "typically required of fleet service clerks (e.g., loading and unloading cargo, cleaning cabin interiors, and guiding taxiing aircraft)," which "almost invariably require

The level of discretion vested in a defendant may also be influenced by the context in which they perform their work. For instance, defendants who are entrusted with access to highly secured areas, such as prison workers, may hold positions of trust regardless of their work duties.[6] Other

---

oversight"). Because this approach is so different from the Pardo test, we find the First Circuit precedent offered by Douglas, holding that airport employees who could bypass security did not hold positions of trust, to be largely inapposite to our analysis. See Parrilla Roman, 485 F.3d at 190-91 (baggage handlers who used their ability to bypass airport security to load drugs onto flights undetected were not in a position of trust because the mere presence of "security clearance . . . cannot transmogrify a menial position into a position of trust."); United States v. Correy, 570 F.3d 373, 395 (1st Cir. 2009) (citing Parrilla Roman, and concluding that airport janitor who transported drugs into the airport using his security clearance lacked the managerial discretion needed for a position of trust).

[6] Courts have warned that the enhancement cannot be so expanded as to apply to "every bank teller who has access to the bank's money and every janitor who cleans an office where desk drawers are left unlocked." United States v. Tann, 532 F.3d 868, 870-71, 875-76 (D.C. Cir. 2008) (defendant who stole money from employer by forging checks to herself did not abuse a position of trust because "to apply the enhancement to a defendant merely because he or she is entrusted with valuable things and has little or no supervision while performing his or her duties would stretch the abuse-of-trust enhancement to cover endless number of jobs involving absolutely no professional or managerial discretion, in clear contravention of the plain language of the

courts of appeals have held that prison workers who abuse their ability to enter a prison without being searched to conspire with inmates and smuggle contraband hold positions of trust under § 3B1.3. See United States v. Gilliam, 315 F.3d 614, 618 (6th Cir. 2003) (prison counselor who smuggled contraband to prisoners); United States v. Brown, 7 F.3d 1155, 1162 (5th Cir. 1993) (prison food service manager who smuggled contraband to inmates); United States v. Armstrong, 992 F.2d 171, 172-73 (8th Cir. 1993) (prison instructor who solicited inmates to obtain illegal items). This is because "the public places tremendous trust in prison employees that they will not conspire with inmates to violate the law." Gilliam, 315 F.3d at 618 (internal quotation marks, citation, and alteration omitted).

Because of the paramount public importance of airport security, the discretion that comes with security access at an airport can be viewed through a similar lens as prisons. Airport security in the United States is run by the TSA, a government entity created in the aftermath of September 11 to ensure the safety of those who fly. To this end, the TSA checks the identification of and searches all passengers. Areas that were formerly accessible to nontravelers, such as boarding areas, are now off-limits to all but those who have cleared security or have security clearances. Airport security is now considered a critical component of national security,

---

commentary to section 3B1.3") (alteration and citation omitted). As a general matter, we do not disagree with these sentiments, but we conclude that Douglas does not fall in the same category given the unique trust the public and the government place in employees who can bypass TSA security restrictions in airports.

and it is axiomatic that government authorities granting access to secured areas expect those with such access to act with integrity, and that the public trusts airport employees not to use their positions to circumvent security measures to smuggle weapons or other contraband. For this reason, an airport employee granted a security clearance is reasonably viewed as one who occupies a position of public trust that can be breached by using his or her position to further a crime. See United States v. Higa, 55 F.3d 448, 453 (9th Cir. 1995) (leaving undisturbed the § 3B1.3 enhancement imposed on an airline customer service representative who "used his position with the airline to gain entry into areas where others could not" to smuggle drugs) (internal quotation marks omitted); cf. United States v. Roberts, 660 F.3d 149, 165 n.6 (2d Cir. 2011) (applying § 3B1.3 to airline employee on the basis of his managerial position of private trust, and declining to consider whether the "enhancement was further warranted by [his] abuse of a position of public trust, specifically, his abuse of access to restricted airport areas, a trust conferred by federal . . . authorities, to facilitate his drug trafficking scheme").[7]

Bearing in mind the critical importance of airport security, and the expansive nature of Douglas's access to

---

[7] Roberts was an airline crew chief charged with assigning crews to load and unload airplanes who used this position to facilitate drug trafficking. Roberts, 660 F.3d at 153-54. He abused his position by assigning crew members who were part of the conspiracy to offload airplanes carrying drugs while diverting crews that were not connected to the conspiracy to other jobs to prevent them from discovering the illicit activity. Id.

secured areas at SFIA, including the planes themselves, we cannot say that the District Court erred in concluding that Douglas held a position of public trust. While the record does not indicate that Douglas held a supervisory position or disclose the amount of supervision he received when performing his mechanic duties, it is evident that he was vested with significant discretion, as he was permitted unfettered access to planes, which airports go to great lengths to protect, screening every passenger who seeks to board them and inspecting each bag placed on them. This freedom allowed Douglas to "commit a difficult-to-detect wrong" because it permitted him to bypass security measures, dramatically reducing the likelihood that luggage containing the drugs would be searched.[8] Pardo, 25 F.3d at 1192 (emphasis omitted). He was vested with discretion in exactly the area that related to "the object of the wrongful act"—he was able to move freely into the terminal without inspection. Id. Finally, it is reasonable to infer that airport leadership and government authorities granted him a security clearance in "reliance on [his] integrity," trusting that he would not abuse it to circumvent the purposes of airport security. Id.

Douglas's argument that his job did not relate to preventing drug smuggling, and thus did not vest him with authority relating to the "object of the wrongful act," Pardo, 25 F.3d at 1192, is unpersuasive. The fact that he was not

---

[8] That Douglas could have been subjected to random searches does not alter this conclusion, as Douglas was still trusted to move past security at will without inspection the vast majority of the time, which gave him the means to commit the crime.

specifically tasked with preventing the type of wrong that he committed does not undermine the conclusion that he was able to commit it as a result of the position of trust he held. Like the prison employees who were not specifically tasked with preventing contraband from moving through the prisons, Douglas took advantage of his largely unfettered access at the airport to surreptitiously move contraband, and thereby abused his position of public trust. See Gilliam, 315 F.3d at 618; Brown, 7 F.3d at 1162; Armstrong, 992 F.2d at 172-73.

For these reasons, the District Court did not err in applying a two-level enhancement to his offense level pursuant to § 3B1.3.

C

We next examine the application of the § 3C1.1 enhancement for obstruction of justice. Section 3C1.1 provides a two-level increase in the offense level where "the defendant willfully obstructed or impeded . . . the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and [ ] the obstructive conduct related to . . . the defendant's offense of conviction . . . ." U.S.S.G. § 3C1.1. "[W]illfully failing to appear, as ordered, for a judicial proceeding" is covered conduct. Id. § 3C1.1 cmt. n.4(E). "Willfully" in this context means "deliberately or intentionally; in other words, not negligently, inadvertently, or accidentally." United States v. Jenkins, 275 F.3d 283, 287 (3d Cir. 2001) (internal quotation marks omitted). The word "willful . . . when used in a criminal statute . . . generally means an act done with a bad purpose." United States v. Belletiere, 971 F.2d 961, 965 (3d Cir. 1992) (internal quotation marks omitted). The government bears the

burden of proving that the defendant "willfully obstructed or impeded . . . the administration of justice" by a preponderance of the evidence.  Id.

The District Court adopted the PSR's recommendation to impose the obstruction of justice enhancement based on Douglas's "fail[ure] to appear for trial on January 8, 2014." PSR ¶ 27.  During the hearing addressing his failure to appear, the District Court was provided with medical records and informed that Douglas had been in the hospital.  The District Court considered the records and arguments and said that "[t]here's no solid evidence, at least presented, that he was suffering from a medical condition that warranted him not to appear.  It's really sort of ambiguous."  App. 390-91. As a result, the District Court concluded that there was a "substantial risk" that Douglas would not appear at trial and thereby disrupt the administration of justice.  App. 391.  In connection with sentencing, the District Court relied on these facts to impose the § 3C1.1 enhancement, making no additional factual findings on the subject, and declared the objection to the enhancement to be "without merit." [9]  Supp. App. 236.

---

[9] At the sentencing hearing, the District Court requested clarification for the basis on which the Government sought the enhancement, asking that it "[b]e more specific with regard to obstruction" and whether its basis was "[f]ailure to appear for court."  App. 407.  The Government said it was but also listed several allegedly false statements Douglas made that caused law enforcement to waste investigatory effort.  Douglas's attorney then stated that he had been under the impression the obstruction of justice enhancement "was predicated on failure to appear for trial."

Douglas asserts that the District Court erred in imposing the enhancement. He points out that he provided a medical explanation for his absence from trial, notes that the District Court made no findings that he willfully failed to appear for trial, and argues that the subsequent reinstatement of his bail and the granting of travel requests shows that the District Court "did not find that the Appellant's failure to appear on his jury selection date was willful." Appellant's Br. at 35.

While there is no question that Douglas was aware of the date of trial and he intentionally did not appear in court, the record does not show that he willfully failed to appear. Douglas provided medical documentation that explained his absence. These records show that he awoke the morning of trial with chest pain and went to the emergency room at 2:00 a.m., underwent tests showing a possible heart blockage, abnormal white blood cell count, and elevated heart enzyme levels, and was treated with insulin and aspirin. His complaints were taken seriously, as reflected by the fact that he was transported by ambulance to the hospital's urgent care facility for tests. Most significantly, the documentation included a page entitled "verification of treatment" signed by a medical doctor at 4:12 p.m. on January 8, 2014, which stated that Douglas received care and requested that the court "[p]lease excuse Mr. Douglas' absence from court today." Given this documentation, we are unable to determine why

_____

App. 408. The Government repeated that there were multiple reasons but that "[b]oth the probation office and [the Court] already ruled on them." App. 408-09. The District Court then stated "I agree. That matter has already been thoroughly covered. The Court has ruled on it." App. 409.

21

the District Court viewed his medical excuse skeptically or described the documentation as "ambiguous." App. 391.

Moreover, the Government bears the burden of proof and offered no evidence to show Douglas's conduct was willful, in the sense that Douglas deliberately schemed not to appear in court by feigning illness. See United States v. Batista, 483 F.3d 193, 195-97 (3d Cir. 2007) (five mental health evaluations showed defendant was feigning a mental illness to avoid being found competent). In fact, during the bail review hearing the Government stated it was "possible that he went to the [hospital] faking this illness, so he would not have to be here. It is also possible that that was a legitimate illness. I don't think that anything in the records tell us one way or the other." App. 388. The Government therefore viewed the record as being in equipoise. This is not proof by a preponderance of the evidence that Douglas willfully failed to appear. Absent such proof from the Government showing willfulness, and in light of the medical documentation presented indicating a lack of willfulness, the application of a § 3C1.1 enhancement was improper.[10]

---

[10] Because we will remand for resentencing due to the erroneous application of the enhancement, we need not address the substantive reasonableness of the sentence. United States v. Merced, 603 F.3d 203, 214 (3d Cir. 2010). We do note, however, that with respect to substantive reasonableness, Douglas argued only that the District Court did not consider § 3553(a)(6)'s mandate that courts avoid unwarranted sentencing disparities among codefendants. He asserts that his 240-month sentence is excessive in comparison with his coconspirators who he claims held managerial roles and participated in the conspiracy for a

By improperly applying the obstruction of justice enhancement, the District Court did not accurately calculate Douglas's Guidelines range. See United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011) (noting that the application of sentence enhancements is used in calculating a defendant's Guidelines range). Failure to make a "correct computation of the Guidelines range" constitutes procedural error. Id. (citing United States v. Langford, 516 F.3d 205, 214 (3d Cir. 2008)).

Here, Douglas's total offense level with the enhancement was 43, which corresponds to life imprisonment. Without the § 3C1.1 enhancement, Douglas's total offense level corresponds to 360 months to life imprisonment. Ultimately, the District Court applied a downward variance and imposed a sentence of 240 months. While the District Court may still have imposed a sentence of 240 months absent the § 3C1.1 enhancement, we cannot be sure. See, e.g., Vazquez-Lebron, 582 F.3d at 446 ("[W]e cannot be sure that the district court would have imposed the

---

longer time. Putting aside the fact that Douglas was a lynchpin of the conspiracy's San Francisco activities and that he played a more significant role than other conspirators, and thus he does not share "exactly parallel[ ]" circumstances with them, United States v. Iglesias, 535 F.3d 150, 161 n.7 (3d Cir. 2008), his parity complaint would not entitle him to any relief. "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006). As a result, Douglas "cannot rely upon § 3553(a)(6) to seek a reduced sentence" based on alleged disparity between his sentence and those imposed on his co-defendants. Id.

same sentence if not for the error."); <u>Langford</u>, 516 F.3d at 219 ("[This] is not that rare case where we can be sure that an erroneous Guidelines calculation did not affect the sentencing process and the sentence ultimately imposed."); <u>see</u> <u>also</u> <u>Molina-Martinez v. United States</u>, 136 S. Ct. 1338, 1345 (2016) ("When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."). We will therefore reverse the application of the § 3C1.1 enhancement and remand for resentencing.

### III

For the foregoing reasons, we will affirm the District Court's conclusion regarding drug quantity and its application of the enhancement for abuse of a position of trust, reverse the enhancement for obstruction of justice, and remand for resentencing.

**USA v. DOUGLAS, 15-1754**

GREENAWAY, JR., *Circuit Judge*, concurring in part, dissenting in part,

The Sentencing Guidelines are meant to constrain judicial discretion, focusing and channeling decisions about criminal punishment in order to provide consistent, disciplined conclusions. I fear that my colleagues have shed those constraints. By disregarding the binding source of law here—the Sentencing Guidelines themselves—the majority has left the abuse of a position of public trust enhancement without limits on its scope. The Guidelines, and our consistent precedent in applying them, delineate particular sorts of abuse of trust which trigger this enhancement. The majority's interpretation sweeps those textual and precedential distinctions away, rendering the enhancement indiscriminately applicable to a panoply of criminal actors. I am compelled to dissent.[1]

Some violations of trust—but not all—are crimes. And when they are crimes, violations of trust are sometimes—but not always—subject to increased punishment. The Sentencing Guidelines provide a two-level enhancement for defendants who "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In this case, Douglas undoubtedly violated the trust placed in him by his employer, by the airport, and implicitly by the traveling public. The majority rightfully recoils at that breach. But Douglas's crime did not abuse a position of trust,

---

[1] I join Parts I, II.A, and II.C of the majority opinion.

1

as defined by the Guidelines, and it is the Guidelines we are called upon to apply here.[2]

I begin my analysis of § 3B1.3 with the text of the Guideline and its accompanying note. The commentary to the Guidelines is authoritative and must be given "controlling weight" unless plainly erroneous or in violation of the Constitution or a federal statute. *United States v. Keller*, 666 F.3d 103, 108 (3d Cir. 2011) (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)). The commentary to the Guidelines are binding on federal courts and supersede even prior judicial interpretations of the Guidelines. *Id.* Note 1 to Guidelines § 3B1.3—worth quoting in full—provides that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an

---

[2] This conduct could, of course, be considered as part of the sentencing court's analysis under 18 U.S.C. § 3553(a).

embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, Note 1.

The plain meaning of this Note makes clear that the sentencing enhancement is not meant to apply to cases like this one. The Sentencing Commission limited the enhancement to the abuse of positions characterized by "professional or managerial discretion." The majority would write these terms out of the Guidelines entirely. After correctly observing that those without professional or managerial job *titles* can nevertheless abuse positions of trust, the majority goes further than the Guidelines allow, reducing the analysis only to whether the defendant has discretion "vis-à-vis the object of the wrongful act." Maj. Slip. Op. at 13 (citing *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994). Never again does the majority ask nor mention whether that discretion is the variety specified by the Guidelines: professional or managerial discretion. These terms modify the word "discretion" and must be given effect. *See United States v. Cheape*, 889 F.2d 477, 480 (3d Cir. 1989) (applying rule against superfluities to Sentencing Guidelines). Any interpretation of § 3B1.3 that provides an enhancement for discretion generally, rather than only professional or managerial discretion, is broader than what the Guidelines provide.

3

Nor does the majority address the remainder of the Note. The Sentencing Commission further explained exactly what sort of discretion characterizes a position of trust: "substantial discretionary judgment that is ordinarily given considerable deference." Deference is at the core of the Guidelines' definition of a position of trust, but is nowhere to be found in this case. The paradigmatic examples of positions of trust provided for by the Sentencing Commission are characterized by this sort of deference. A patient defers to a doctor's medical expertise and allows him to set a course of treatment; she substitutes his judgment for her own. U.S.S.G. § 3B1.3, Note 1. In "the case of an embezzlement of a client's funds by an attorney serving as a guardian," the client has delegated financial decisionmaking to his attorney; her embezzlement relies on that substitution of judgment. U.S.S.G. § 3B1.3, Note 1.

Who defers to Douglas's discretionary judgments? No one. The majority asserts that Douglas's discretion was manifest in his ability "to move freely into the terminal without inspection." Maj. Slip. Op. at 16. But that freedom of movement pertains to Douglas himself. He did not exercise decisionmaking power on behalf of others who deferred to his position or expertise. This is not the kind of discretion specified by the Guidelines.

In fact, Douglas is more akin to the "ordinary bank teller or hotel clerk" whom the Guidelines expressly specify are not covered. U.S.S.G. § 3B1.3, Note 1. A bank teller has physical access to highly sensitive locations—cash tills, vaults, perhaps safe deposit boxes—and may be permitted to move through the bank freely, without inspection. But bank tellers are not subject to the abuse of a position of trust enhancement. Freedom of movement is a form of discretion,

4

but it is not the managerial or professional discretion that is subject to this enhancement.

The history of § 3B1.3 only underscores the importance of these provisions. Prior to a set of 1993 amendments, Note 1 provided only that "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller." U.S.S.G. § 3B1.3 note (Historical Notes, 1993 Amendments). The Sentencing Commission added its discussion of "professional or managerial discretion" and of deference to the defendant's judgment to its Commentary in 1993. These qualifications cannot be ignored, minimized, or flattened into a general discussion of abuse of trust; the Commission acted specifically to include them.[3] *Cf. Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

---

[3] Other courts have recognized that the specific addition of these terms "places a significant limit on the types of positions subject to the abuse-of-trust enhancement," even compared to the pre-1993 version of the statute. *United States v. West*, 56 F.3d 216, 220 (D.C. Cir. 1995). *See also United States v. Contreras*, 581 F.3d 1163, 1166 (9th Cir. 2009), *opinion adopted in part, vacated in part*, 593 F.3d 1135 (9th Cir. 2010) (en banc) (comparing pre- and post-amendment tests).

In addition to the express terms of Note 1, the provisions of Note 2 offer further reason not to apply the § 3B1.3 sentencing enhancement to Douglas. Note 2 provides that "[n]otwithstanding Application Note 1 . . . an adjustment under this guideline shall apply to the following." It then lists specific contexts in which physical access suffices for § 3B1.3 to apply, including cases in which postal workers engage in the theft or destruction of undelivered mail or in which defendants abuse their position to obtain identification information, as when a hospital orderly misappropriates information from a patient's chart. § 3B1.3 Note 2. Thus, Note 2 carves out certain exceptions in which the enhancement applies where it would not otherwise. Were these low-level workers covered by the definitions in Note 1, there would be no cause to single them out separately in Note 2.

The principle of *expressio unius est exclusio alterius* instructs us that because the Sentencing Commission singled out two areas where low-level workers who abuse their physical access are subject to the enhancement—theft of mail by postal workers and identity theft—the Commission did not mean to cover other low-level employees who abuse their physical access. *See United States v. Jankowski*, 194 F.3d 878, 884 (8th Cir. 1999) ("the enhancement for postal employees is an exception to the general definition as stated in the first paragraph of note 1. . . the exception is limited and meant only to protect the delivery of the mail.")

Airports may be, as the majority writes, a special and sensitive context, in which all employees are held to a higher standard. If so, the Sentencing Commission has the power to single out airport employees for coverage based only on access, just as it did postal workers. But the Sentencing

6

Commission did not do so. The Sentencing Commission singled out postal workers.[4] It is not for the courts to impose their own substantive beliefs in place of those of the expert body tasked with preparing the Guidelines. *Cf. Mistretta v. United States*, 488 U.S. 361, 379, 393 (describing Sentencing Commission as "expert body" making "political judgment[s]."); *United States v. Frank*, 864 F.2d 992, 1015 (3d Cir. 1988) (comparing Commission's "extrajudicial task of delegated substantive rulemaking" with "judicial function" of imposing sentences).

We are bound to follow the Sentencing Commission's notes in interpreting the Guidelines. *United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013) ("guidelines commentary, interpreting or explaining the application of a guideline, is binding on us when we are applying that guideline because we are obligated to adhere to the Commission's definition"). The majority, however, barely engages with the Guidelines' text. Rather, their analysis rests almost entirely on the judicially-created tests we have previously elaborated. I do not believe that the text of the Guidelines allows us to impose the § 3B1.3 sentencing enhancement on Douglas. If our precedent compelled such an outcome, I would conclude that our precedent needed to be brought into line with the authoritative interpretations set forth in the notes to the Guidelines. But our cases are entirely consistent with the principles set forth above – at least until now.

---

[4] Identity theft was added in 2005 amendments, in response to a new statutory mandate. U.S.S.G. § 3B1.3 note (Historical Notes, 2005 Amendments). *See* Identity Theft Penalty Enhancement Act, Pub. L. 108-275, 118 Stat. 831 (2004).

7

The majority laid out the three-part *Pardo* test which structures our determination of whether a defendant occupies a position of trust. *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994). And the majority properly noted that this test must be applied purposively, steered by the "guiding rationale of the section—to punish 'insiders' who abuse their position rather than those who take advantage of an available opportunity." *Id. See also United States v. DeMuro*, 677 F.3d 550, 567-68 (3d Cir. 2012) (restating standard).

However, the majority failed to heed its own admonition about the section's purpose. Indeed, at one point the majority summed up Douglas's crime by stating that he "took advantage of his largely unfettered access at the airport to surreptitiously move contraband." Maj. Slip Op. at 17. While we eschew "magic words" formalisms in our analysis, it is revealing that the majority described Douglas using precisely the language that our precedent uses to describe when § 3B1.3 is inapplicable. Douglas did, in fact, only "take advantage" of an opportunity for criminality. For this reason, § 3B1.3 does not cover him.

Our jurisprudence has also consistently recognized that the § 3B1.3 sentencing enhancement only applies in the specific context laid out in the Guidelines. For example, we have described the enhancement as applying to "relationships." *DeMuro*, 677 F.3d at 568 (including "a mother/daughter relationship and a babysitter/child relationship" as well as a parishioner/church advisor relationship (citations omitted)). Positions of trust, under the Guidelines, are relational, existing between defendants and those who defer to their judgment.

8

Likewise, although we do not limit the enhancement to "formal" fiduciary relationships, we routinely ask whether relationships were "analogous to the fiduciary relationship" or "fiduciary-like." *United States v. Iannone*, 184 F.3d 214, 225 (3d Cir. 1999). *See also United States v. Bennett*, 161 F.3d 171, 196 (3d Cir. 1998) ("It was this fiduciary position that Bennett occupied . . . that caused the District Court to find Bennett held a position of trust relative to his victims."); *United States v. Sokolow*, 91 F.3d 396, 413 (3d Cir. 1996) ("Sokolow argues that no fiduciary relationship existed with NIBA members in connection with the submission of premiums. . . . We disagree.").

We have also looked specifically for professional or managerial discretion, in the particular sense provided for by the Guidelines: that clients defer to the considered judgment of the defendant, who operates outside effective supervision. *See United States v. Babaria*, 775 F.3d 593, 597 (3d Cir. 2014) ("there was no one supervising Dr. Babaria's position as the medical director and manager of Orange"); *United States v. Kennedy*, 554 F.3d 415, 425 (3d Cir. 2009) ("Kennedy's claim that neither Ursuline nor its clients placed special reliance upon her is specious because she was responsible for *managing* her clients' finances.") (emphasis added); *United States v. Hart*, 273 F.3d 363, 377 (3d Cir. 2001) (categorizing stockbrokers based on discretion to freely trade granted by their customers, and assessing § 3B1.3 applicability accordingly); *Iannone*, 184 F.3d at 225 (describing defendant's managerial position); *United States v. Nathan*, 188 F.3d 190, 206 (3d Cir. 1999) ("Nathan held the highest position in the company"); *United States v. Sherman*, 160 F.3d 967, 970 (3d Cir. 1998) (finding physicians not subject to effective supervision because of "their education

9

and training and analysis . . . inherent in the profession"); *Bennett*, 161 F.3d at 196 (defendant "exercised unlimited managerial discretion over the organizations and their staffs").

Indeed, the only case the majority cites with respect to the nature of professional or managerial discretion, *United States v. Thomas,* 315 F.3d 190, 204 (3d Cir. 2002), involved a home health aide who used her influence over her elderly patient, who "appeared to rely on her judgment and integrity," in order to fraudulently cash checks. The aide was empowered to open her patient's mail "without supervision" and was given "authority to pay bills for her." *Id.* While a home health aide is not inherently trusted with professional discretion like a doctor or attorney might be, we found that this particular home health aide was given the same power to substitute her judgment for that of her ward.

Douglas's crime displays none of the features that we have looked for in our past applications of § 3B1.3. His criminal behavior is not rooted in any particular trust-based relationship akin to doctor/patient or parent/child. He owed no fiduciary obligation to the airline, airport or public, nor even something analogous to a fiduciary obligation. He was not supposed to place any third party's interests above his own, nor did he imply that he would do so. Rather, his obligations were those of everyone else: not to smuggle drugs. And the record does not show Douglas exercising managerial or professional discretion, whether by operating at the top of his company's organization chart or by deploying specialized knowledge not easily second-guessed.

All our past cases comport with the text of § 3B1.3, emphasizing that the abuse of a position of trust must always

10

involve a relationship of deference. We have never before found mere physical access, even in a restricted setting, to demonstrate a position of trust. We should not do so here.

Bearing this in mind, a proper application of the *Pardo* three-part test should not cover Douglas's behavior. I agree with the majority that his ability to move through the airport with limited security screening enabled him to "commit a difficult-to-detect wrong," the first *Pardo* factor. *Pardo*, 25 F.3d at 1192.

But Douglas lacked "authority . . . vis-à-vis the object of the wrongful act." *Id.* In *Pardo*, we observed that the defendant "had no authority over anyone or anything." *Id.* Authority means more than simply the right to be somewhere. Authority, as we recognized, is exercised with respect to another, who is ordered, controlled, or affected by that authority. *See Authority*, Black's Law Dictionary (10th ed. 2014) ("1. The official right or permission to act, esp. to act legally on another's behalf . . . the power delegated by a principal to an agent."). Like Pardo, Douglas did not have *authority* over someone or something other than himself, even if he had certain privileges within the airport.

As for the third factor, "whether there has been reliance on the integrity of the person occupying the position," the record offers little information. *Pardo*, 25 F.3d at 1192. The majority claims that we can infer that the airport and government authorities trusted Douglas because they granted him a security clearance. Maj. Slip. Op. at 16. This is tautological. If this were the test, then every cashier given access to a register would have been hired in "reliance on [his] integrity." All employers must trust their employees to some extent; the third *Pardo* factor asks how and why that

11

trust is manifested. Properly understood, this third factor contrasts those who can be trusted due to their independent professional obligations or their own personal virtues from those who can only be trusted if supervised or regulated. *Cf. Iannone*, 184 F.3d at 225 (finding third factor met because victims relied on "resume listing years of experience," "posing as a decorated Vietnam veteran," and "perceived integrity as owner and CEO."); *Sherman*, 160 F.3d at 970 ("[T]he insurance company relied on the integrity of Sherman as a doctor holding a medical license.").

As the majority admits, the record simply does not disclose what supervision Douglas received as a mechanic – nor does it demonstrate what factors secured Douglas his access to the airport. This is insufficient to determine whether he was trusted because of his integrity, or simply because an airline has no option other than to trust someone to fix their aircrafts.[5] The third *Pardo* factor, therefore, cannot support the application of the § 3B1.3 sentencing enhancement.

The experience of other courts of appeals supports this conclusion. As the D.C. Circuit has stated, Douglas "may have occupied a position of trust in the colloquial sense that [he] was trusted not to use [his] access for nefarious purposes; in that sense, so is every bank teller who has access to the

---

[5] Of course, this analysis would be entirely different had Douglas used his expertise as a mechanic to somehow purposefully damage or endanger the safety or integrity of an aircraft. Such a circumstance might more logically be denoted an abuse of a position of trust pursuant to the Guidelines.

bank's money and every janitor who cleans an office where desk drawers are left unlocked." *United States v. Tann*, 532 F.3d 868, 875 (D.C. Cir. 2008). *See also United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003) ("the fact that Ms. Edwards was trusted by her employer with significant responsibility-even to the point of allowing her to bypass usual accounting controls and pick up customer checks from incoming mail-is not determinative.").

The majority distinguishes *Tann* based upon "the public safety dimension" of airport employment, "the nature of the access he had, and how he used it." Maj. Slip. Op. at 14 n.6. Put simply, they assert that airports are special, such that physical access across an airport per se converts a job into a position of public trust. Without minimizing the importance of airport security, I cannot agree. There is simply no limiting principle.

As noted by the majority, airport security took on new significance in the wake of the September 11 attacks, the deadliest terrorist incident in American history. The second deadliest terrorist attack was the Oklahoma City bombing, which took place at a federal office building. Associated Press, *Service Held to Mark 20 Years since Oklahoma City Bombing*, Chi. Tribune, Apr. 19, 2015. Are we to hold that anyone with security access to a large office building—say a janitor trafficking in drugs in the building's basement—also holds a position of trust? What about those with access to subway systems, nightclubs, hotels, or schools—all sites of recent mass violence? Deciding that certain large facilities are so important that everyone in them holds a position of trust is a policy determination, one properly left to the Sentencing Commission or Congress. As already noted, the Commission has singled out certain institutions as per se

13

involving the public trust—most notably the mail—and airports are not among them.

The only reasoned opinions addressing whether access to secured areas of an airport makes a position one of public trust, both from the First Circuit, have found that airport employment must be subjected to the same "professional or managerial discretion" analysis as any other job. *United States v. Parrilla Roman*, 485 F.3d 185, 190-91 (1st Cir. 2007) (involving airport baggage handlers who helped smuggle drugs); *United States v. Correy*, 570 F.3d 373, 395 (1st Cir. 2009) (involving airport janitor who helped smuggle drugs). The majority suggests that the First Circuit's approach to § 3B1.3 diverges so greatly from our own that these cases are entirely inapposite. I am unpersuaded.[6] But regardless of the differences or similarities between our tests, the First Circuit opinions have at least some persuasive

---

[6] According to the majority, the First Circuit uses a "two-step process" that asks first the "status question" of whether the defendant's position was characterized by professional or managerial discretion and only then asks the "conduct question" of whether that position was abused. *Parrilla Roman*, 485 F.3d at 190-91. But our own Court has held that "[i]n applying § 3B1.3, a court must initially determine whether the defendant occupied a position of public or private trust. If he did occupy such a position, then the court must determine whether the defendant abused this position of trust in a way that significantly facilitated his crime." *Iannone*, 184 F.3d at 222. If our two-step inquiry is distinct from that of the First Circuit, it is a distinction without any substantial difference. Certainly, our tests are similar enough that we can learn from the First Circuit's reasoning.

power, for at the end of the day, they interpret the same Guideline.

The First Circuit looked to see whether the defendants could establish policies or supervise co-workers and whether they were in fact unsupervised. *Parrilla Roman*, 485 F.3d at 192. The First Circuit hewed to the instructions of the Guidelines and focused on professional and managerial discretion; the majority here fails entirely to engage with these issues. Likewise, the First Circuit properly distinguished between mere physical access—the same privileges enjoyed by bank tellers—and authority. As they held, "the security clearance awarded to [defendant] cannot transmogrify a menial position into a position of trust." *Id.* at 191.

The other airport cases cited by the majority do not carry any persuasive weight as to whether § 3B1.3 applies to anyone abusing their security access to an airport. The Second Circuit expressly declined to consider "whether a § 3B1.3 enhancement was further warranted by Roberts's abuse of a position of public trust, specifically, his abuse of access to restricted airport areas, a trust conferred by federal CBP [Customs and Border Patrol] authorities, to facilitate his drug trafficking scheme." *United States v. Roberts*, 660 F.3d 149, 165 n.6 (2d Cir. 2011). As the majority correctly notes, the enhancement was applied to Roberts on the basis of his abuse of the private trust imparted to him by the airline. He served in a managerial position, assigning employees under his supervision to load airplanes. He used this managerial power to further his drug trafficking operation by assigning those who were part of the scheme to unload airplanes with drugs and keeping away those who were not in on the operation. *Roberts*, 660 F.3d at 153-54. This supervisory

15

role serves as a valuable contrast to Douglas's case, where no such managerial powers were employed.

The Ninth Circuit has upheld the application of § 3B1.3 to an airline customer service representative who, to further a drug conspiracy, "used his position with the airline to 'gain entry into areas where others could not.'" *United States v. Higa*, 55 F.3d 448, 453 (9th Cir. 1995). But the Ninth Circuit did not seriously engage with this question; its cursory treatment was focused on whether the defendant's acquittal on two counts precluded the application of § 3B1.3 on two other offenses. *Id.* Unlike the First Circuit's analysis, which engages with the substance of the Guidelines, *Higa* lacks any power to persuade on this issue.

In support of its contention that certain institutions are so sensitive that anyone with access can be found to be in a position of trust with respect to the general public, the majority cites a trio of cases—all from outside this circuit— concerning prison staff. These involve a drug counselor who attempted to buy cocaine from his counselee, *United States v. Gilliam*, 315 F.3d 614 (6th Cir. 2003); a food manager who participated in a scheme to alter money orders, *United States v. Brown*, 7 F.3d 1155 (5th Cir. 1993); and a prison instructor who conspired with inmates to manufacture and pass counterfeit bills, *United States v. Armstrong*, 992 F.2d 171 (8th Cir. 1993).

As the majority observes, these cases do appear to carve out a special status for prisons, based on the public's "right to expect and trust that those in the employ of the government for the purpose of rehabilitating criminals will refrain from entering into the kind of criminal enterprises that necessitated such rehabilitation in the first place." *Gilliam*,

315 F.3d at 619. This is true as far as it goes. Other courts (not ours) have found that one context (not airports) should be treated specially under § 3B1.3.

But our sister circuits are far from uniform in their application of § 3B1.3 to prison staff. The Ninth Circuit, for example, rejected the application of § 3B1.3 to a prison cook who enjoyed access to inmates without being required to be thoroughly searched upon entry. *United States v. Contreras*, 581 F.3d 1163, 1168-69 (9th Cir. 2009), *opinion adopted in part, vacated in part*, 593 F.3d 1135 (9th Cir. 2010) (en banc). The Eleventh Circuit decided likewise in another case involving a food service worker granted access to the prison without searches, observing that a contrary reading would "extend to virtually every employment situation because employers 'trust' their employees." *United States v. Long*, 122 F.3d 1360, 1365-66 (11th Cir. 1997).

Moreover, the grounds on which prisons have been singled out do not extend to airports. The *Gilliam* counselor was supposed to help inmates avoid drug abuse; instead, he recruited them into a trafficking scheme. *Gilliam*, 315 F.3d at 617. He violated his specific duties to the public and those under his care. In contrast, airline mechanics have no greater obligation to prevent drug smuggling than anyone else. In *Armstrong*, the court analogized correctional officials to police officers, on whom abuse of trust enhancements are routinely and easily applied. 992 F.2d at 173. *Cf. United States v. Brann*, 990 F.2d 98, 282-83 (3d Cir. 1993) ("Needless to say, a police officer occupies a position of public trust, and the commission of a crime by a police officer constitutes an abuse of that trust. . ." (internal citations omitted)). Does it behoove us to equate airline mechanics with law enforcement officers in our jurisprudence?

17

It is also well-established that prisons are a "unique context." *Johnson v. California*, 543 U.S. 499, 541 (2005) (Thomas, J., dissenting); *see also Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 173 (3d Cir. 2011) (discussing "unique institutional concerns that arise in the prison setting"). The fact that some courts have taken prisons out from the ordinary § 3B1.3 analysis does not mean that we should single out airports.

I cannot take fault with the majority's conviction that Douglas violated the trust placed in him by the traveling public. An airplane mechanic's ability to walk contraband onto a commercial flight threatens the confidence we each try to maintain in the security of our aviation system. But not every violation of trust, in that everyday sense, triggers the sentencing enhancement of § 3B1.3. The Sentencing Commission has specified that only certain acts—those violating positions of trust characterized by professional or managerial discretion and by deference to the defendant's judgment rather than abuse of his access—qualify. Douglas's acts do not.

I am compelled to dissent because the majority's departure from both the Guidelines and our own precedent leaves us without any principled limitation on the scope of § 3B1.3. Under the majority's approach, I see no way to restrict § 3B1.3 to airport employees using their security access to commit crimes but not to workers at other facilities with areas off-limits to the general public. The Guidelines do not warrant, or permit, such an expansion, and its commentary is binding upon us. I respectfully dissent.